E-FILED
Wednesday, 25 July, 2018  02:54:46 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | |
|---|---|
| CHARLES BRYANT, N61320,<br>ALFRED JOHNSON, R23237, and<br>BRIAN D. CURTIS, R55894,<br>individually and on behalf of a Class of persons<br>similarly situated,<br><br>　　　Plaintiffs,<br><br>v.<br><br>JOHN R. BALDWIN, Acting Director of the<br>Illinois Department of Corrections,<br>DR. STEVE MEEKS, Chief of Health Services of<br>the Illinois Department of Corrections, and<br>WEXFORD HEALTH SOURCES, INC.,<br><br>　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Case No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## CLASS ACTION COMPLAINT FOR
## DAMAGES AND INJUNCTIVE RELIEF

### Preliminary Statement

1. The Illinois Department of Corrections and its medical contractor Wexford Health

    Sources, Inc., have a policy, practice, and custom of not providing needed surgeries to

    incarcerated people who suffer from painful hernias, except in emergency circumstances.

    A hernia is a condition wherein the abdominal wall weakens or tears, causing other

    internal tissues (such as intestines) to be forced through it. Hernias can be extremely

    painful and debilitating, and if left untreated, can lead to infection, bowel obstruction, and

    even death. Despite the fact that surgical repair is the only way to prevent those negative

    outcomes, Defendants have a policy of refusing to provide hernia surgeries, except in

    emergency circumstances, for the purpose of reducing costs and increasing profits. This

    policy prohibits medical staff from exercising medical judgment and has resulted in the

1

denial of surgeries to dozens, if not hundreds of hernia patients, leaving them in severe

pain, unable to participate in normal activities, and at risk for serious complications. This

policy and practice causes the wanton infliction of pain and amounts to deliberate

indifference to the serious medical needs of those incarcerated in the IDOC system, in

violation of the Eighth Amendment to the United States Constitution.

This complaint was drafted in similar form to a similar class action filed

September 16, 2015 in federal court in the Northern District of Florida, Tallahassee

Division, by inmates held in Florida Department of Corrections facilities alleging

substantially similar complaints. (Case 4:15-cv-00452-RH-CAS)

**Jurisdiction and Venue**

2. This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 and 1343

    because the claims raise Federal Questions as to the deprivation of each Plaintiff's rights

    under 42 U.S.C. § 1983 and under the Eight Amendment to the Constitution.

3. Plaintiffs' claims for relief are predicated, in part, upon 42 U.S.C. § 1983, which

    authorizes actions to redress the deprivation, under color of state law, of rights,

    privileges, and immunities secured by the Constitution and laws of the United States, and

    upon 42 U.S.C. § 1988, which authorizes the award of attorneys' fees and costs to

    prevailing plaintiffs in actions brought pursuant to 42 U.S.C. § 1983.

4. Venue is proper in this district pursuant to 28 U.S.C. §1391(b), (c), and (d) as Defendants

    do business in this judicial district and division, and many of the events or omissions

    giving rise to the claims occurred in this judicial district and division.

5. Plaintiffs seek a preliminary and permanent injunction pursuant to Rule 65, Federal Rules of Civil Procedure.

## Parties

6. Plaintiff Charles Bryant is incarcerated in the IDOC system at the Danville Correctional Center and was at all relevant times. He suffers from a serious medical need, a painful hernia, and his medical condition warrants surgical repair of his hernia, yet he has not been allowed to undergo surgery for his hernia.

7. Plaintiff Alfred Johnson is incarcerated in the IDOC system at Pontiac Correctional Center and was at all relevant times. He suffers from a serious medical need, a painful hernia, and his medical condition warrants surgical repair of his hernia, yet he has not been allowed to undergo surgery for his hernia.

8. Plaintiff Brian D. Curtis is incarcerated in the IDOC system at Menard Correctional Center and was at all relevant times. He suffers from a serious medical need, a painful hernia, and his medical condition warrants surgical repair of his hernia, yet he has not been allowed to undergo surgery for his hernia.

9. Defendant John R. Baldwin is the Acting Director of the Illinois Department of Corrections (IDOC). As such, he is responsible for the overall operation of the IDOC, including the operation of prison facilities. Defendant Baldwin has a non-delegable duty to provide constitutionally adequate medical care to all persons in his custody. He is sued in his official capacity for injunctive and declaratory relief.

10. Dr. Steve Meeks is the Chief of Health Services for the Illinois Department of Corrections.  As such, he is responsible for the delivery of healthcare services to inmates at IDOC prison facilities.  Defendant Meeks has a non-delegable duty to provide

constitutionally adequate medical care to all persons in his custody. He is sued in his official capacity for injunctive and declaratory relief.

11. Defendant Wexford Health Sources, Inc. (Wexford) is an out-of-state Florida for-profit corporation, registered and doing business in Illinois. Since approximately 2011 Wexford has contracted with the IDOC to provide medical care services to inmates confined in the majority of IDOC prisons. Wexford has a custom, policy and practice in place and enforces the corporate policy and custom regarding hernias described herein. Upon information and belief, all medical professionals (including doctors, nurse practitioners, physician assistants and nurses) at the relevant institutions are employed by, or contracted with Wexford, and act within the scope of their employment. Defendant Wexford is sued for injunctive and declaratory relief, and damages.

12. Defendant Wexford and its employed physicians conduct a process known as Collegial Review, a form of utilization management, whereby the medical needs of individual inmates are discussed, and requests for referral for specialty care for those inmates is either denied or approved.

13. The actions of the Defendants and their agents were performed under color of state law and constitute state action.

## GENERAL FACTUAL ALLEGATIONS

### *Hernias*

14. An abdominal wall hernia occurs when an organ or other tissue is forced through a weak spot in the abdominal wall. An inguinal hernia occurs when contents of the abdomen— including intestines and fat—bulge through a tear or weakness in the groin area (where

the lower abdomen meets the inner thigh). The tissue may recede back into the abdomen and then bulge out again, depending on the patient's position and activity.

15. Inguinal hernias are a type of abdominal wall hernia and the most common type of hernia. In men, inguinal hernias can cause internal tissue to be forced into the scrotum, pressing on the testicles and causing severe pain.

16. There are other types of abdominal wall hernias, including but not limited to umbilical hernia, incisional (ventral) hernias, femoral hernias, epigastric hernias, and Spigelian hernias and usually all of these hernias involve weak areas in the abdominal wall which allows abdominal contents to slip through the wall.

17. Groin hernias (i.e., inguinal and femoral hernias) are very common—the prevalence of groin hernias has been estimated to be between 5 and 10 percent in the United States, with inguinal hernias accounting for the vast majority. The estimated lifetime risk of developing a groin hernia is about 25 percent in men. Femoral hernias are much less common than inguinal hernias and they are more common in women.

18. Abdominal hernias often cause severe pain, which typically worsens with activity or exertion. Routine and necessary activities such as walking, running, lifting, coughing, urinating, defecating, and even sitting up can cause the tissue to bulge out of the abdominal wall, causing intense and excruciating pain. Hernias can be so painful that they prevent people from engaging in any activities, forcing patients to be bedridden. Other symptoms of inguinal hernias include weakness, feelings of heaviness, burning, tearing, or aching in the groin; or a swollen or enlarged scrotum. If left untreated, a hernia can lead to serious complications, including the intestines becoming trapped in the

scrotum or the abdominal wall, which can lead to bowel obstructions, tissue necrosis, sepsis, the excision of intestines, and even death.

19. There is no connection between the size of the hernia and the amount of pain it produces. That is, smaller hernias can be just as painful, or more so, than larger hernias.

20. An abdominal wall hernia wherein the bulging tissue can be pushed back into place is a *reducible* hernia. Many times, however, the bulging tissue will become trapped and cannot be pushed back into place—this is a *non-reducible* or *incarcerated* hernia. Reducible hernias can be just as painful (or more so) than non-reducible hernias. Many hernias are reducible at times and nonreducible at others. A reducible hernia can become permanently non-reducible and incarcerated at any time.

21. A prisoner with an abdominal wall hernia who is expected to walk and stand in straight lines on the prison compound cannot simply lie down on the ground to push his intestines back into place whenever the hernia bulges out of his abdominal wall.

22. If an incarcerated hernia is untreated, it can become *strangulated*, meaning the blood supply to the bulging tissue is cut off, causing the tissue to die. This is an emergency situation requiring immediate surgery. Failure to treat a strangulated hernia can lead to severe infection, intestinal obstruction, the excision of intestines, and death.

23. A hernia is typically diagnosed with a physical exam and patient history. Imaging tests (such as an X-ray, CT scan, or ultrasound) may be helpful, but these scans may not detect an abnormality, especially if the bulging tissue is receded into the abdomen during the scan. Thus, a negative scan does not mean that a hernia is not present.

24. The only definitive treatment for an abdominal wall hernia is surgical repair. Without surgery, the tear or weakness in the abdominal wall will never heal, and the patient will

continuously suffer from intense pain, discomfort, and limited activity; as well as the risk of infection, intestinal obstruction, and death. The risk of developing complications increases as more time elapses without treatment.

25. Thus, the proper treatment for a hernia begins with referral to a surgeon for a surgical consultation. The generally accepted medical practice for a patient with a hernia is to perform surgery if the patient is symptomatic; that is, experiencing pain, an inability to walk, an inability to work or engage in other normal life activities, or other symptoms.

26. A "hernia belt," truss, jock strap, or other binding options are not treatment for hernias. They are often unhelpful, do nothing to treat the condition, and can actually be harmful.

27. The medical standard of care for a patient with a symptomatic hernia is surgical repair as soon as possible after detection and determination that the hernia is adversely affecting the patient's activities of daily living. The medical standard of care requires the medical decision-maker to consider and take into account whether the patient is experiencing pain from the hernia, when determining if the patient is a candidate for surgery. Basing the decision to perform surgery solely on whether the hernia is reducible, irrespective of other symptoms, falls far below accepted medical practice and the standard of care.

28. Surgery to repair abdominal wall hernia is one of the most common surgeries performed in the United States. It is a relatively simple procedure. Some statistics suggest that more than 1 million abdominal wall hernia repairs are performed each year in the United States, with inguinal hernia repairs constituting nearly 770,000 of these cases.

29. The classification of a surgery as "elective" has no bearing on whether the condition it will alleviate is a serious medical need. Any procedure that it not an emergency can be

classified as elective; this does not mean that failure to perform it will not result in severe pain and other serious complications.

The medical literature supports the view that the mean mortality rate associated with elective surgical hernia repair is approximately 0.2%, whereas the mean mortality rate for emergency surgical hernia repair is approximately 4%. Stated another way, the mean mortality rate for emergency surgical hernia repair is twenty (20) times higher than elective hernia surgery repair. Stated yet a third way, the mean mortality rate for emergency surgical hernia repair has been estimated to be about two thousand percent (2000%) higher as compared to elective surgical hernia repair. **Operation Compared with Watchful Waiting in Elderly Male Inguinal Hernia Patients: A Review and Data Analysis, INCA Trialists Collaboration**, *J Am Coll Surg*, Vol. 212, No. 2, February 2011

The medical literature supports the view that when a patient incurs an incarcerated abdominal wall hernia, the morbidity and mortality for those patients remains high. As compared with elective repairs, patients with incarcerated abdominal wall hernias have higher morbidity and mortality rates. A study concluded with the finding that patients with incarcerated abdominal wall hernias require emergency surgery and have high mortality and morbidity rates. **Factors Affecting Morbidity and Mortality in Patients Who Underwent Emergency Operation for Incarcerated Abdominal Wall Hernia**, *Int. Surg* 2012; 97:305-309

### *IDOC and Wexford's Unlawful Policy of Denying Hernia Surgeries*

30. People incarcerated within the IDOC system are completely dependent upon Defendants to provide them with medical care. Prisoners are not free to seek their own care, even if they can pay for it.

31. In general, the delivery of medical care within the IDOC is supposed to work in the following manner. If a prisoner has a medical issue, the inmate can access sick call, where the inmate usually sees a nurse. The nurse can refer the inmate for an appointment with the institution nurse practitioner, physician assistant, or physician, as the case may be. If the medical provider believes a consult with an outside specialist (off-site from the prison facility) is needed, a consultation request may occur through a process known as "Collegial Review". That request is forwarded to Wexford's out-of-state office. During the collegial review process, several options may occur. For example, the request for specialty referral may be denied, approved, or additional information may be requested. If the request is approved, the inmate is usually eventually sent to the specialist. Then the process repeats itself: If the specialist feels a certain procedure is needed, the specialist submits a consult report to Wexford, advising it that a specific treatment is warranted. That recommendation must again be put through the collegial review process where it may be approved or denied.  If approved, the procedure is scheduled at some point in the future.  Often, surgical recommendations are denied in favor of conservative, non-surgical options.

32. Collegial Review is in effect the "gatekeeper" and makes the final determination whether medical care will be provided. Collegial Review decision are often made by someone who is not a specialist in the area at issue, and almost always without ever evaluating the

patient personally. The Collegial Review decision is most often made by an out-of-state individual, who is unlicensed to practice medicine in the state of Illinois. The Collegial Review physician is not subject to the Illinois Medical Licensing Board, per se, as that individual is usually not licensed in Illinois. On information and belief, the out-of-state Collegial Review physicians are employed by Wexford in violation of Illinois' prohibition against the corporate practice of medicine. (See Illinois Supreme Court decision, *Berlin v. Sarah Bush Lincoln Health Center*, 179 Ill. 2d 1, 688 N.E.2d 106 (1997))

33. Rather than making decisions based on medical judgment, however, Defendants make health care decisions based on costs, in a way that prevents medical professionals from exercising medical judgment in deciding what treatment to provide and when it should be provided. That decision-making is illustrated by Defendants' approach to patients with hernias. Specifically, Defendants have a policy, practice, and custom of not providing hernia surgeries to prisoners except in emergency circumstances. One facet of this *de facto* policy is that Defendants generally do not provide surgery if the hernia has been reducible at any time, no matter what symptoms (including pain), the patient is experiencing. The "emergency circumstances" exception is narrow and allows surgery only in life-threatening situations, with no regard for the pain or debilitation that the patient is experiencing. The *de facto* policy does not take into account the fact that hernias often adversely affect a patient's activities of daily living.

34. Thus, when an inmate presents with a painful hernia, one of several things happen: The institution physician refuses to submit a consult request for the patient to see a general surgeon for surgical evaluation. Or, the institution physician submits the request, which is

then denied in Collegial Review. Or, the consult request is granted, but after the surgeon recommends surgery, the surgery is denied again or significantly delayed in Collegial Review. All of these actions are taken pursuant to Defendants' policy and the *de facto* execution of the policy.

35. To make matters worse, when an inmate is seen at sick call, the inmate may be charged a monetary copayment, regardless of whether treatment is eventually provided.

36. Defendants have enforced this policy, practice, and custom despite knowing that failing to provide these surgeries will lead to prisoners being left in excruciating pain, limited in their activities, and at risk for serious complications or death. Defendants have acted with deliberate indifference to the serious medical needs of people incarcerated in the IDOC system.

### *Allegations Regarding Named Plaintiffs*

#### *Plaintiff Charles Bryant*

37. Charles Bryant is an inmate at IDOC facility, Danville Correctional Center, N61320, birthdate 9/8/60 To the best of his knowledge and belief, he developed an abdominal wall hernia in 2010 while housed in Lawrence Correctional Center. Mr. Bryant was informed by the staff that the IDOC and Wexford Health Sources (Wexford) do not perform elective hernia surgery operations and informed him he would need to wait until he was released from prison to get the hernia "fixed". Since 2010, Mr. Bryant's hernia has been painful, and it has affected his ability to carry out his activities of daily living. Mr. Bryant has now been informed he has cancer on his right kidney. Mr. Bryant has filed grievances in the past seeking treatment for his hernia, without success.

11

*Plaintiff Alfred Johnson*

38. Alfred Johnson is an inmate at IDOC facility, Pontiac Correctional Center, R23237, birthdate 7/13/84. Mr. Johnson has had an abdominal wall hernia for many years while housed within the IDOC system. He has requested to have his hernia surgically evaluated on multiple occasions. At times, Mr. Johnson's hernia is described as the size of a cantaloupe. He has filed complaints through the grievance process related to his hernia, to no avail. He has been informed by staff that the IDOC and Wexford do not perform elective hernia surgery operations until the hernia causes serious problems.  He has recently filed two emergency grievances wherein he reiterated the shockingly large size of his hernia and rated his pain as a 12 on a standard 1 to 10 pain scale.  Nevertheless, as of this filing, both emergency grievances have been ignored entirely, the inmate receiving no response and no additional medical care.

*Plaintiff Brian D. Curtis*

39. Brian D. Curtis is an inmate at IDOC Menard Correctional Center, R55894, birthdate 8/11/69. Mr. Curtis developed an abdominal hernia in his upper abdomen above his umbilicus about ten years ago. The hernia became progressively more painful and larger in size. It was described as the size of a softball. He begged and pleaded to be allowed to have hernia surgery. Towards late 2017, Mr. Curtis threatened litigation if he was not allowed to be evaluated by a surgeon. Eventually he was granted his demands for surgical evaluation and a surgeon informed Wexford that surgery "had to be performed to avoid a catastrophe".  Wexford recanted and allowed him to undergo surgery. The patient suffered pain for about ten years. He was informed by the surgeon that due to the size of

his hernia the hole in his abdomen was the size of a baseball requiring mesh to fill the hole.

### *Other Examples of Defendants' Deliberate Indifference*

40. Defendants' Deliberate indifference is not limited to the named Plaintiffs.  Defendants' have refused to allow many inmates suffering form symptomatic hernias to be seen by a surgeon for a surgical consult, despite the clear need to do so.  Many of them have been recommended for consultations by institutional physicians, which have then been denied by Collegial Review. Others receive no Collegial Review at all.  Some examples follow.

41. **Earvin C. Allen, Jr.** is an inmate at IDOC facility, Western Illinois Correctional Center, R44758, birthdate 12/9/86.  Mr. Allen developed a hernia which was diagnosed while he was incarcerated within the IDOC prison system. He attempted to obtain surgical evaluation and treatment for the hernia on multiple occasions. He has filed grievances related to his condition. He was informed by the staff that the IDOC and Wexford do not perform elective hernia surgery operations until the hernia causes serious problems. He suffered from recurrent pain from the hernia and difficulty with his activities of daily living. He subsequently continued to complain, and hernia surgery was performed on his hernia after a significant delay at Passavant Area Hospital in Jacksonville, Illinois. The patient developed complications related to scar tissue that had formed at the hernia site. On or around February 10, 2017 an ultrasound was performed on the patient's right testicle showing lack of blood flow to the right testicle. Emergent surgery was performed to surgically remove his right testicle at St. John's Hospital in Springfield, Illinois.

42. **Kevin Cobbs** is an inmate at IDOC facility, Dixon Correctional Center, R12292, birthdate 8/29/73. Mr. Cobbs developed an abdominal wall hernia sometime in 2016, and

since that time it has gotten progressively more painful and progressively larger in size. Due to the size of the hernia, the patient complains it is progressively affecting his penis with pain. Mr. Cobbs has repeatedly complained to the healthcare providers and staff at Dixon, without any success. He desires to have the hernia repaired to relieve him from his pain. He has been informed the IDOC and Wexford do not perform "cosmetic surgery" on hernias.

43. **Angel R. Dieppo** is an inmate at IDOC facility Dixon Correctional Center, N41468, birthdate 01/20/63. Mr. Dieppo has had an abdominal hernia for many years. He has been informed by IDOC and Wexford staff they do not perform elective hernia surgery operations. The patient has abdominal pain from the hernia. He is unable to stand up for long periods due to the excruciating pain. He has pain when he bends over. He is unable to lift heavy objects because it aggravates his hernia and causes him pain. His activities of daily living have been adversely affected. He has previously been at Danville Correctional Center, Henry Hill Correctional Center and now is at Dixon Correctional Center. He has been unable to get his hernia surgically repaired at any of the IDOC facilities.

44. **Scott F. English** is at IDOC facility, Dixon Correctional Center, B75930, birthdate 12/13/69. Mr. English suffered from an abdominal hernia for approximately six years. The hernia was medically neglected by Wexford and the staff for that same time period. Mr. English complained repeatedly about his hernia to the medical staff. He was repeatedly told by Wexford staff that he did not "fit the criteria" to have hernia surgery and he was informed Wexford does not routinely approve hernia surgery. Eventually the hernia progressed to involve his right scrotum. It grew to the size of a grapefruit. In

March 2018, after Mr. English had complained for about six years regarding his hernia, he was allowed to have surgery to repair the hernia. The treating surgeon is alleged to have described the hernia as a "neglected large right inguinal hernia with large direct and indirect components. The surgeon indicated that due to the size of his neglected hernia, he was at risk for hernia recurrence.

45. **Drumaine McKinley** is at IDOC facility, Menard Correctional Center, K66354, birthdate 03/07/79. Mr. McKinley had an abdominal hernia about which he complained and requested that it be surgically repaired. There was a delay in performing the surgery and as a result of the delay the patient has now experienced complications from the hernia and its repair. The patient complains that the time period between the hernia diagnosis and its repair caused or contributed to the problems he is now suffering related to his delayed hernia surgery. He has had two repairs already due to the delays he incurred.

46. **Ray T. Overton** is at IDOC facility, Mount Sterling Correctional facility, B24102, birthdate 06/05/70. Mr. Overton suffered from an abdominal hernia for seventeen years. He told the staff that he was in pain from his hernia. He was repeatedly informed that Wexford does not repair hernias unless an emergency develops. Over the time period, he was in Joliet Correctional Center, Menard Correctional Center, and Mount Sterling Correctional Center. Staff at each facility repeatedly informed him that Wexford and IDOC do not approve hernia surgery unless there is an emergency. After developing worsening problems, a surgeon performed hernia surgery upon him on 09/28/17. The operating surgeon informed Mr. Overton that he had never seen a hernia like this one, it

had dropped into his scrotum and it was very huge. Post-operatively, he continues to experience pain from the site due to the delay in performing the surgery on a timely basis.

47. **Shannon C. Reynolds** is at IDOC facility, Taylorville Correctional facility, B82375, birthdate 11/28/73. Mr. Reynolds has been suffering from a left inguinal hernia for many years, back to about 2011. It has now dropped into his left scrotum. He has submitted grievances on multiple occasions, exhausting his administrative appeals and/or otherwise had his grievances ignored. He filed an emergency grievance on 9-20-16, yet this grievance was not even responded to as required under the policies. He has received three referrals by prison physician Dr. Nawoor (on 7/20/16, 8/17/16 and 9/21/16) for surgical evaluation that have all been denied by Wexford's Collegial Review panel in Pittsburg. The patient complains he has a painful hernia that has not been treated. He experiences pain with walking and it routinely swells up. It adversely affects his activities of daily living. Health Care administrator Lisa Mincy, RN, BSN sent him a letter 9-29-16, indicating "hernia repairs are an elective surgery unless the hernia becomes incarcerated then it is an emergency surgery……the physician has evaluated your condition and the hernia is not an emergency procedure that needs performed". Dr. Nawoor has informed the patient he knows the hernia belt is "ineffective", but Wexford will not approve surgical consultation.

48. **Tyrone Rhodes** is at IDOC facility, Dixon Correctional Center, K64099, birthdate 07/25/72. Mr. Rhodes has a painful hernia which has dropped into his left scrotum. He has been attempting to have a surgical consultation since at least 2015, or so. His hernia is constantly painful, and he has informed the Wexford healthcare providers but they have refused to approve him for independent surgical consultation.

49. **Michael Thompson** is at IDOC facility, Dixon Correctional Center, K59931, birthdate 04/24/61.  Mr. Thompson had medical complaints between 2014 and 2017, including complaints of hernia pain. Wexford and IDOC refused and delayed in timely treating his hernia and other medical problems, including straining to urinate. His hernia caused him pain and difficulties from his activities of daily living. He was diagnosed with a hernia in December 2014 and diagnosed with prostate cancer in September 2015. He continued to complain of problems from his hernia. After a lengthy delay, he eventually underwent hernia surgery and prostate cancer surgery on 12/08/17.

50. Additionally, there are pending in this District a number of individual suits by inmates alleging deliberate indifference related to delays or refusal to refer the inmate plaintiffs for independent surgical consultation, including, but not limited to:

      a. *Lizell Bryant v. Baldwin, et al,* 16-cv-01162

      b. *Miles Barnes v. Sood, et al,* 15-cv-04058

      c. *Toywell Mitchell v. Sood, et al,* 16-cv-04012

51. On information and belief, there are also a significant number of similar individual cases pending in the Northern District and Southern District of Illinois as well, each making the same basic allegations; that Defendants were deliberately indifferent to an inmate's serious medical need by reason of Wexford's policy of refusing to approve a surgical referral for an inmate's symptomatic but not yet life-threatening abdominal wall hernia.

52. In *Heard v. Sheahan*, 148 F. App'x 539, 540 (7th Cir. 2005), the Seventh Circuit has already determined that the plaintiff's symptomatic but not yet life-threatening inguinal hernia constituted a serious medical condition.  This hurdle to bringing a deliberate indifference case now cleared, the District Courts of this state have been and will

continue to be flooded with individual cases alleging deliberately indifferent to an inmate's serious medical need by reason of Wexford's policy of refusing to approve a surgical referral for an inmate's symptomatic but not yet life-threatening abdominal wall hernia.

### *Wexford's History of Providing Inadequate Medical Care*

53. The IDOC has contracted with Wexford to provide virtually all medical healthcare in the majority of, if not all, of the IDOC's prison facilities.

54. Wexford has a long history of providing inadequate care.  In addition to the numerous pending individual suits against it, in 2014 the District Court in *Lippert v. Godinez*, No. 1:10-cv-04603 (N.D. Ill. Dec. 2014) commissioned a neutral expert report prepared to "assist the court in determining whether the Illinois Department of Corrections ("IDOC") is providing health care service to the offenders in its custody that meet the minimum constitutional standards of adequacy.'" Final Report of the Court Appointed Expert, Ron Shansky, MD et al., at 3, *Lippert v. Godinez*, No. 1:10-cv-04603 (N.D. Ill. Dec. 2014). Unsurprisingly, the neutral expert determined that it was not.  Citing numerous examples throughout the 400+ page "Lippert Report", the court-appointed expert determined that Wexford "has been unable to meet minimal constitutional standards with regards to the adequacy of its health care program for the population it serves." *Id*. at 45.

55. Under the contract, Wexford is paid a contractual rate by the State of Illinois to provide healthcare services to inmates within the IDOC facilities. Wexford has a contract which requires the State of Illinois to pay Wexford in excess of One Billion Dollars over ten years to provide medical care to inmates. Wexford is contractually required to pay for medically necessary healthcare services to inmates.  The majority of all costs of

providing health care to inmates are intended to be borne by Wexford. Notwithstanding its contractual obligations, when an inmate is caused to suffer an emergency situation such as a strangulated hernia and then goes to the hospital for emergency surgery, the State of Illinois is contractually obligated to pay for that emergency surgery. In contrast, if the hernia surgery is performed electively at an outpatient surgery center prior to the condition becoming a life-threatening emergency, then Wexford is obligated to pay for the elective surgery.  As such, under Defendants' current custom, policy and practice, the people of the State of Illinois are forced to pay twice for medical care provided to inmates housed within IDOC facilities.  Firstly, the people of Illinois pay Wexford the +$1 Billion to provide medical services to inmates. Secondly, when Defendants refuse to provide necessary hernia surgery and when the inmate suffers an emergency incarcerated or strangulated hernia, then the people of Illinois pay a second time because bills for emergency hospital services are paid for by the state of Illinois, rather than Wexford, under the contract terms.

56. Wexford has a financial incentive to avoid providing medical care and treatment until it becomes an emergency, especially when that care involves sending prisoners to outside specialists, because when the inmate requires emergency care at a hospital, the State of Illinois pays the bill.

57. Similarly, Wexford has a financial incentive to avoid providing medical care and treatment by delaying surgical referral and/or authorization for recommended surgery until after an inmate is paroled into the community.  Once an inmate is released from prison, Wexford's contractual obligation for care ends and any further care needs are generally borne by the State of Illinois through the Medicaid program or similar

state/federally reimbursed coverage.  Thus, there Wexford can simply wait out an

inmate's parole date, it can against shift the cost of care onto the people of the State of

Illinois.

58. Pursuant to the Hospital Report Card Act, 210 ILCS 86, the Illinois Department of Public

Health (IDPH) collects data publishes an on-line Illinois Hospital Report Card and

Consumer Guide to Health Care. (http://www.healthcarereportcard.illinois.gov/)

Statewide, for the one-year time period 10/1/16 through 9/30/17, hospitals and

freestanding facilities across the state reported performing 16,844 surgical inguinal hernia

repairs with median charges for inguinal hernia surgery at all facilities reported at

$18,966.76.  The IDPH figures can be used to illustrate:  Assuming a frequency

percentage of 10% and assuming a total Illinois prison population of 40,992[1], there could

be 4,099 inmates within the IDOC prison system with abdominal wall hernias.

Hypothetically, if even only one-third (1,366 inmates) of the 4,099 inmates who are

assumed to have hernias underwent surgical repair, and assuming median facility fee

charges of $18,966, then the facility fee charges for these patients would total nearly $26

Million dollars.

    As clarified in the IDPH Report Card site, the reported median charges are the

gross charges or standard prices established by facilities each year and all patients are

charged the same list prices before applying any discounts. The median refers to the

midpoint of all charges. Charges are for facility services and likely will not include

---

[1] Current IDOC total population as of February 28, 2018, according to April 2018 Quarterly
Report of the Illinois Department of Corrections (most recent publicly available data) found at:
https://www2.illinois.gov/idoc/reportsandstatistics/Documents/IDOC_Quarterly%20Report_Apri
l_%202018.pdf

surgeon fees. By refusing to perform elective hernia surgeries on inmates, Wexford is

able to improperly shift payment responsibility back to the people of the state of Illinois,

who then pay the bill when emergency surgery is performed on an inmate at an area

hospital.

### Exhaustion

59. The Plaintiffs have exhausted their administrative remedies.

60. While it is anticipated that not all potential class members will have exhausted their

administrative remedies related to their individual circumstances, Plaintiffs assert that

given the existing Wexford policy and pervasive practice of denying surgical referral for

not-life-threatening symptomatic hernias, each potential class member should be deemed

to have constructively exhausted his/her administrative appeal obligations.  Further,

requiring every potential class member to exhaust his/her administrative remedies would

be contrary to public policy and constitutionally dubious.

### Class Action Allegations

61. Pursuant to Federal Rule of Civil Procedure 23(b)(2), Plaintiffs seek to certify a class of

all current and future prisoners in IDOC custody who have presented, or will present,

with a symptomatic hernia to prison medical staff. This class seeks only declaratory and

injunctive relief.

62. Pursuant to Rule 23(b)(3), Plaintiffs seek to certify a class of all past and current

prisoners in IDOC custody (through the date of a settlement or judgment) who have

presented with a symptomatic hernia to prison medical staff. This class seeks damages, as

well as declaratory and injunctive relief.

63. For both the 23(b)(2) and 23(b)(3) class, Plaintiffs seek to further certify two subclasses:

a. *The Pre-Surgical Sub-Class*: This sub-class consists of all class members who have a symptomatic abdominal wall hernia but who have been denied or unreasonably delayed in receiving a referral for a surgical consult and/or receiving recommended corrective surgery.

b. *The Post-Surgical Sub-Class*: This sub-class consists of all class members who previously suffered a symptomatic abdominal wall hernia and who suffered an unreasonable delay in obtaining corrective surgery, resulting in prolonged pain, suffering, limitation of daily activities, a worsening of their condition, the need for more extensive surgery, and/or other adverse effects causally related to the delay.

64. Upon information and belief, Defendants have the ability to identify all such similarly situated class members, through medical and other records in Defendants' possession.

65. The requirements of Rule 23(a) are satisfied:

a. *Numerosity.* The class is so numerous that joinder of all members is impracticable. Given that there are roughly 40,992 prisoners in IDOC custody and considering the prevalence of hernias in the United States has been estimated at 5-10%, there could be 4,000 or more class members just in the Pre-Surgical Sub-class. While not every inmate with an abdominal wall hernia necessarily is a candidate for immediate surgical repair, a significant number of the class warrant surgical consultation and consideration for surgery by an experienced surgeon.  It is unknown just how many members are in the Post -Surgical Sub-Class but may amount to many thousands over the term of Wexford's contract with IDOC.

Medical and other records currently in Defendants' possession can be used to identify the as yet unknown class members.

b. *Commonality.* There are questions of law or fact common to the class, including but not limited to whether Defendants' policy of not providing hernia surgeries except in emergency situations, for the purpose of decreasing costs and increasing profits, constitutes deliberate indifference to the serious medical needs of the class members in violation of the Eighth Amendment.

c. *Typicality.* The claims or defenses of the class representatives are typical of the claims or defenses of the class. The class representatives either presently have painful hernias that have gone untreated by Defendants and have suffered (and continue to suffer) from the same pain, debilitation, and other substantial risks of serious harm that the class members have suffered or have previously suffered a hernia what was not timely treated, resulting in substantial additional damages.

d. *Adequacy.* The class representatives and class counsel will fairly and adequately protect the interests of the class. The class representatives are committed to obtaining declaratory and injunctive relief, which will benefit themselves as well as the class by ending Defendants' unconstitutional policy. The class representatives are also committed to fairly administering any damages award or settlement. Their interests are consistent with and not antagonistic to the interests of the class. They have a strong personal interest in the outcome of this action and have no conflicts with members of the class. They are represented by experienced counsel who specialize in civil rights and complicated litigation on behalf of prisoners.

66. The requirements of Rule 23(b)(2) are satisfied, as the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole. Defendants have applied the same policy—refusing to provide hernia surgery except in emergency situations—to virtually all class members as a whole. Injunctive relief will therefore end the policy for all class members, allowing them to receive proper medical evaluation and treatment.  Because a past medical history of an abdominal wall hernia makes a patient far more likely to suffer subsequent additional hernia(s), even those members of the Post-Surgical Sub-Class will greatly benefit from injunctive relief that ends the current "delay-and-deny" policy.

67. The requirements of Rule 23(b)(3) are satisfied, as questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The interests of members of the Plaintiff Class in individually controlling the prosecution of a separate action is low in that most members of the Plaintiff Class would be unable individually to prosecute any action at all. Most members of the Plaintiff Class will not be able to find competent counsel to represent them. It is therefore desirable to concentrate all litigation in one forum. The alternative would be individual cases for each and every prisoner seeking similar relief.  There have been numerous individual cases already filed by inmates alleging substantially the same types of complaints, some of which have been litigated to the 7th Circuit Court of Appeals. Accordingly, it will promote judicial efficiency to resolve the common questions of law and fact in one forum, in one lawsuit, rather than in multiple lawsuits in multiple courts.

### CAUSE OF ACTION
### 42 U.S.C. § 1983
### All Defendants' Violations of the Eighth Amendment

68. All Defendants, including Defendants' policymakers for medical care, know about and enforce the policies described herein and have turned a blind eye to the serious medical needs of the inmates. All Defendants, including Defendants' policymakers for medical care, know of Plaintiffs' serious medical needs (including their severe pain, debilitation, and increased risk of serious complications), yet Defendants have intentionally failed to provide and have intentionally delayed treatment that will address those serious medical needs, knowing that their actions have resulted, and will continue to result, in Plaintiffs' continued suffering. Thus, Defendants have caused the wanton infliction of pain upon IDOC prisoners and have exhibited deliberate indifference to the serious medical needs of Plaintiffs and the Plaintiff Class, in violation of the Eighth Amendment.

69. By denying Plaintiffs their medically needed hernia surgeries, Defendants have imposed punishment far in excess of that authorized by law, and contrary to the Eighth Amendment.

70. Defendants' denial of Plaintiffs' medically needed hernia surgeries violates all standards of decency, and is contrary to the Eighth Amendment.

71. All Defendants' actions and "treatment" with respect to Plaintiffs' hernias is medical care so cursory as to amount to no medical care at all.

72. Plaintiffs who have not received surgery have no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand the following relief:

A. An order certifying this case as a class action, with the class defined under Rule 23(b)(2) (seeking only declaratory and injunctive relief) as all current and future prisoners in IDOC custody who have presented, or will present, with a symptomatic hernia to prison staff, and under Rule 23(b)(3) (seeking damages as well as declaratory and injunctive relief) as all past and current prisoners in IDOC custody (through the date of a settlement or judgment) who have presented with a symptomatic hernia to prison staff. One key to resolving this dispute will be to obtain unbiased, objective expert medical testimony defining the term "symptomatic hernia".

B. An order certifying two sub-classes: The Pre-Surgical Sub-Class, consisting of all class members who have a symptomatic abdominal wall hernia but who have been denied or unreasonably delayed in receiving a referral for a surgical consult and/or receiving recommended corrective surgery, and the Post-Surgical Sub-Class, consisting of all class members who previously suffered a symptomatic abdominal wall hernia and who suffered an unreasonable delay in obtaining corrective surgery, resulting in prolonged pain, suffering, limitation of daily activities, a worsening of their condition, the need for more extensive surgery, and/or other adverse effects causally related to the delay.

C. A judgment declaring that the Defendants have exhibited deliberate indifference to the serious medical needs of Plaintiffs and the Plaintiff Class and have violated Plaintiffs' and the Plaintiff Class's right to be free from Cruel and Unusual Punishment, as secured by the Eighth and Fourteenth Amendments to the Constitution;

26

D. A preliminary and permanent injunction requiring Defendants to provide inmates who have an abdominal hernia with an independent surgical consultation with a qualified surgical specialist to determine whether the surgical specialists holds the opinion the inmate warrants surgical repair of the hernia.  In cases where the independent surgical specialist holds the opinion surgical repair is warranted, the defendants should be required to immediately provide hernia surgery to all IDOC prisoners who have been recommended for surgery; and, for those prisoners with hernias but who have not seen a surgeon, to immediately send all such prisoners to an independent surgical specialist for a surgical consultation, and to abide by the surgeon's recommendation;

E. A preliminary and permanent injunction requiring any physician who participates in Wexford's Collegial Review process concerning the medical care of Illinois inmates must be licensed to practice medicine in the State of Illinois and subject to the jurisdiction of the Illinois Medical Licensing Board.

F. A judicial declaration that Illinois' doctrine known as the prohibition against the corporate practice of medicine prohibits entities such as Wexford from employing physicians, as set forth by the Illinois Supreme Court in *Berlin v. Sarah Bush Lincoln Health Center*, 179 Ill. 2d 1, 688 N.E.2d 106 (1997), until such time as lawmakers specifically adopt an exception applicable to IDOC prison care.

G. An award of compensatory and punitive damages against Defendant Wexford, and nominal damages against Defendants Baldwin and Meeks;

H. An award of Plaintiffs' attorneys' fees, expenses and costs of suit; and

I. Such other relief as the Court may deem equitable and just under the circumstances.

**Jury Demand**

Plaintiffs demand trial by jury on all issues which are triable by a jury.


Respectfully submitted this _____ day of July, 2018,


By:  s/THOMAS J. PLIURA_____
        Thomas J. Pliura, M.D., J.D.,
        Lead Attorney for Plaintiffs


Thomas J. Pliura,
Attorney for Plaintiffs
Law Offices of Thomas J. Pliura, M.D., J.D., P.C.
P.O. Box 130
LeRoy, IL 61752
Telephone: (309)962-2299
Fax: (309)962-4646
tom.pliura@zchart.com